# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | |
|---|---|
| CLIFFORD ROSEN and ALICE ROSEN, )<br><br>Plaintiffs, )<br><br>v. )<br><br>JASON KING, CHRISTOPHER SLAGER, and ANDREW WITT each in his official and individual capacity, and the CITY OF SOUTH BEND, INDIANA, )<br><br>Defendants. ) | No. 3:10 CV 127 |

## OPINION AND ORDER

Defendants Jason King, Christopher Slager, Andrew Witt, and the City of South

Bend have moved for summary judgments on plaintiffs Clifford and Alice Rosen's claims.

(DE # 53.) For the following reasons, that motion is denied.[1]

## I. Facts and Procedural History

On December 31, 2008, plaintiffs Clifford and Alice Rosen ("the Rosens") boarded

an Amtrak train in Chicago, Illinois, which was scheduled to take them to Washington,

D.C..[2] Before boarding the train, Mr. Rosen observed that the Amtrak staff was not

---

[1] Plaintiffs have moved to file a sur-reply. (DE # 65.) That motion is granted. Plaintiffs have also moved to strike defendants' supplemental reply that included the affidavits of two officers. (DE # 63.) That motion is denied. The affidavits were referenced in defendants' reply brief (DE # 62), and the court has already ruled that it will consider plaintiffs' sur-reply.

[2] The facts that follow are construed most favorably to plaintiffs, the non-moving party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998).

prepared for passengers to board the train. There were no Amtrak employees around to assist passengers boarding the train or to help the Rosens find their sleeping car.

The train was delayed in leaving the station because the dining car had to be changed. After experiencing what he considered to be poor service, Mr. Rosen sought out an Amtrak employee to complain about the service he and his wife had been receiving. (DE # 54 at 2.) Mr. Rosen spoke to an Amtrak manager, but did not get a satisfactory answer. Mr. Rosen then spoke to a second Amtrak employee to inquire about the time that dinner would be served. Mr. Rosen, who at the time was seventy-one years old, has Parkinson's disease, and was concerned about the time dinner would be served because he usually took his Parkinson's medication with his evening meal. Unfortunately, the second Amtrak employee was also unhelpful.

At this point, Mr. Rosen was extremely frustrated and angry. Instead of going back to his sleeping compartment and waiting for dinner, however, Mr. Rosen confronted several Amtrak employees. As the train was leaving Chicago, the train conductor, Keith White, observed Mr. Rosen trying to physically intimidate an Amtrak employee, Joanne Ziegler, in the dining car.[3] Although Mr. White did not remember exactly what Mr. Rosen was saying, he did recall that Mr. Rosen used the words "fuck" and "god damn it." Mr. Rosen was very close to Ms. Ziegler during that encounter, and the two may have even

---

[3] Defendants present testimony indicating that Mr. Rosen confronted several other Amtrak employees, including Monique McLaughlin (*See* DE # 54-2 at 6-7), Daryl Harding (*Id.* at 7), and Josh Poole (*Id.* at 5). Defendants have presented no evidence that Mr. White, the train's conductor who called the police, or the officers that arrived on scene, knew about these incidents prior to Mr. Rosen's arrest.

been touching. Mr. White then told Mr. Rosen to go back to his sleeping compartment to wait for the dinner announcement. Mr. Rosen smiled and simply responded with "no."

After witnessing the encounter between Mr. Rosen and Ms. Ziegler in the dining car, and after Mr. Rosen's refusal to return to his sleeping compartment, Mr. White decided that he needed to call the South Bend police to have Mr. Rosen removed from the train when they got to South Bend, the first manned train station after leaving Chicago.[4] Mr. White contacted the South Bend police department to report the incident.

At that point, dispatch informed defendants Officer Slager, Officer King, and Officer Witt that Amtrak had called and had an unruly passenger on board. The officers[5] then proceeded to the Amtrak station. After arriving at the Amtrak station, the officers met with Mr. White. Mr. White told the officers that there was an unruly passenger on board that had been verbally abusive and drinking heavily. At that point, the officers had no intention of removing Mr. Rosen from the train. The officers wanted to calm Mr. Rosen down to avoid having to remove him from the train in a city that Mr. Rosen was unfamiliar with. The officers and Mr. White then proceeded to the Rosen's sleeper compartment.

---

[4] At some point Mr. White told Mr. Rosen that he was going to call the South Bend police to remove Mr. Rosen. This conversation may have happened during Mr. Rosen's encounter with Ms. Ziegler, or during a separate conversation with Mr. White. (DE # 54-1 at 14.)

[5] There was another officer with the defendants, but that officer is not a defendant in this suit. (DE # 54 at 7.)

After arriving outside Mr. Rosen's sleeper compartment door, the police began yelling and pounding on the door in an attempt to get the Rosens to open the door. Mr. Rosen approached the door and saw that the police were outside. Mr. Rosen did not respond to the officers verbally, but instead simply shook his head "no." Mr. White, who was still outside the door with the police officers, then gave the officers the key to the door. After Mr. Rosen saw the officers had the key to the door, he opened the door voluntarily.

Two of the officers entered the sleeper compartment. One of the officers picked up a bottle of beer and poured it out, stating: "here's the trouble." The other officer found a split of wine Mrs. Rosen had been drinking, poured it out, and said "here's more trouble." Mr. Rosen then raised his hand in an effort to grab onto the bed for support. The officers interpreted this as a threatening pose, and Officer Slager walked Mr. Rosen to a seat in the back of the compartment.

At that point, Mr. Rosen and the officers began speaking to each other about the situation at hand. Officer Slager's primary goal was to keep Mr. Rosen on the train, so he would be able to return home as planned. Officer Slager mentioned that Amtrak did not want Mr. Rosen on the train, and that getting kicked off the train in that area of town would be a bad idea, as the area had a sizeable amount of crime. Mr. Rosen tried to explain his condition and why he was so upset because he had not received his meal, but the officers did not seem to listen.

Mr. Rosen then abruptly stood up, and grabbed the bed for support, which the officers interpreted as Mr. Rosen clenching his fists in a threatening manner.[6] At that point, the officers grabbed Mr. Rosen's arms in an attempt to handcuff him. Although Mr. Rosen was not attempting to punch or hit the officers, he did not put his arms behind his back to be handcuffed. At that point, the officers took Mr. Rosen to the ground. While this was happening, Mrs. Rosen got up from where she was sitting, and tried to grab Officer King, who pushed her back into her seat.

The officers finally got Mr. Rosen's left arm behind his back. This caused Mr. Rosen extreme pain, as he had been unable to extend his arm in that manner since suffering an accident as a child. After the officers were able to get Mr. Rosen's left arm handcuffed, they tried to do the same for Mr. Rosen's right arm, which was underneath his body. Mr. Rosen was unable to get his right arm out from underneath his body on account of the cramped space of the sleeper compartment. The officers told Mr. Rosen to put his right arm around his back, and Mr. Rosen told them that he could not move his right arm.

Officer Slager then punched Mr. Rosen in the back with a closed fist two to three times, and one of the officers stomped on Mr. Rosen's back. When those actions did not work, the officers decided to use their Tasers on Mr. Rosen. Mr. Rosen heard the officers

---

[6] Officer Witt testified that Mr. Rosen was over six feet tall and weighed approximately 200 pounds. (DE # 54-7 at 4.)

say something about Tasering him, and he told the officers not to do that because he was a Parkinson's patient. Both Officer Slager and Officer King deployed their Tasers. Officer Witt was holding onto Mr. Rosen's hand while Mr. Rosen was being Tasered. Mr. Rosen was Tasered three times. Neither officer believed that their Tasers were effective.

After Tasering Mr. Rosen, the officers lifted him up by his shoulders. Once he was on his feet, Mr. Rosen was able to get his right arm behind his back, and the officers handcuffed that arm. Officer Witt then transported Mr. Rosen to the St. Joseph County Jail. On the way to the jail, Mr. Rosen told Officer Witt that his arm was in a great deal of pain, and that he thought it might be broken. He also told Officer Witt that he wanted to go to a hospital. Officer Witt told Mr. Rosen that there was a hospital by the jail.

After arriving at the jail, Mr. Rosen was given a Breathalyzer test, which showed that his BAC was 0.00. Mr. Rosen was seen by a jail nurse, who checked on Mr. Rosen's arm. Officer Witt left the jail after Mr. Rosen was booked. Mr. Rosen was eventually seen by a doctor after leaving the jail, who determined that Mr. Rosen's elbow had two partially torn ligaments. (DE # 61-2 at 95.)

The Rosens brought suit against defendants under 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Specifically, the Rosens brought federal claims for unreasonable search and seizure, excessive force, deliberate indifference to medical needs, summary punishment, and Section 1983 claims against the City of South Bend. Plaintiffs also brought state law claims of trespass, invasion of privacy, false imprisonment, false arrest, assault, battery,

excessive force, intentional infliction of emotional distress, and negligent infliction of emotional distress. Plaintiffs also allege that the City of South Bend is liable for the state law violations under a respondeat superior theory. Defendants have now moved for summary judgment on all of plaintiffs' claims. (DE # 53.)

## II. Legal Standard

FEDERAL RULE OF CIVIL PROCEDURE 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing that there is an absence of evidence to support the non-moving party's case. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex,* 477 U.S. at 323). To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The existence of a mere scintilla of

evidence, however, is insufficient to fulfill this requirement. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986)). The nonmoving party must show that there is evidence upon which a jury reasonably could find for him. *Id.*

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at 255). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998); *Doe,* 42 F.3d at 443. Importantly, the court is "not required to draw *every* conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

## III. Analysis

### A. Federal Claims

In order to succeed on a claim under § 1983, a plaintiff must show: "(1) that defendants deprived him of a federal constitutional right; and (2) that the defendants acted under color of state law." *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006).

Defendants make no argument that the officers were not acting under color of state law. Therefore, the court will proceed to analyze whether defendants deprived plaintiffs of a federal constitutional right.

### 1. Illegal Entry/Search/Seizure

Plaintiffs allege that defendant Slager, King, and Witt violated the Fourth Amendment by entering the sleeper compartment without their consent, a warrant, or any exigent circumstances. (DE # 61 at 13-14.) In response, defendants argue that they did not violate the Fourth Amendment by entering the sleeper compartment without a warrant because they were called to the train by Amtrak employees who had asked them to remove Mr. Rosen from the train and because they had probable cause to arrest Mr. Rosen. (DE # 62 at 5.) For the following reasons, defendants' motion as it relates to this claim is denied.

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . .'" *United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011) (quoting U.S. CONST. amend. IV). "It is . . . 'a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *United States v. Etchin*, 614 F.3d 726, 732 (7th Cir. 2010) (quoting *Payton v. New York,* 445 U.S. 573, 586 (1980)). The same principle is true for hotel and motel rooms. *United States v. Brack*, 188 F.3d 748, 755 (7th Cir. 1999). Courts, however, have refused to extend that same protection to sleeper compartments on passenger trains. *See United States v. Denny*, 441 F.3d 1220, 1224-26 (10th

Cir. 2006) (requiring reasonable suspicion to enter train sleeper compartment to retrieve drugs); *United States v. Colyer*, 878 F.2d 469, 576-76 (D.C. Cir. 1989) ("While an Amtrak sleeper car may in some ways resemble a residence, it enjoys no such status in the law."); *United States v. Whitehead*, 849 F.2d 849, 853-57 (4th Cir. 1988) (superceded in part by statute on other grounds) (requiring reasonable suspicion for a dog sniff in train sleeper compartment); *United States v. Dimick*, 790 F. Supp. 1543, 1548-50 (D. Colo. 1992) (requiring probable cause for search of train sleeper compartment).

The court agrees with the cases that hold a passenger compartment on a train should not be treated as a fixed dwelling. The court also agrees with the *Dimick* court that sleeper compartments on passenger trains are similar to automobiles, and thus, may be searched or entered by law enforcement officials when probable cause exists. *Dimick*, 790 F. Supp. at 1549 ("An analogy may be drawn to automobile searches: because of the inherent mobility of the automobile, there is danger that evidence will be removed or destroyed before a warrant can be obtained. Such exigent circumstances justify a warrantless search and seizure based on probable cause."). Therefore, the officers in this case needed probable cause to enter the Rosens' sleeper compartment.

Defendants agree that the officers needed probable cause in this case (DE # 62 at 5), and argue that the officers "had reason to suspect that Mr. Rosen was guilty of at least public intoxication." (*Id.*) The Seventh Circuit has stated:

> When the question of probable cause arises in a damages suit its resolution typically falls within the province of the jury, though a conclusion that probable cause existed as a matter of law is appropriate when there is no

room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.

*Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994); *see also Phelps v. City of Indianapolis*, No. 1:02–CV–1912, 2004 WL 1146489, at *5 (S.D. Ind. May 20, 2004). "[T]he Fourth Amendment permits an officer to make an arrest when he or she has probable cause to believe that an individual has committed or is committing an act which constitutes an offense under state law . . . ." *Tebbens v. Mushol*, 692 F.3d 807, 818 (7th Cir. 2012).

"The court evaluates probable cause 'not on the facts as an omniscient observer would perceive them,' but rather 'as they would have appeared to a reasonable person in the position of the arresting officer.'" *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) (quoting *Kelley v. Myler,* 149 F.3d 641, 646 (7th Cir. 1998)). "Probable cause, however, does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000); *see also Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999). "When police officers obtain information from an eyewitness or victim establishing the elements of a crime, the information is almost always sufficient to provide probable cause for an arrest in the absence of evidence that the information, or the person providing it, is not credible." *Pasiewicz v. Lake Cnty. Forest Preserve Dist.,* 270 F.3d 520, 524 (7th Cir. 2001).

IND. CODE § 7.1-5-1-3 is Indiana's public intoxication statute:

(a) Subject to section 6.5 of this chapter, it is a Class B misdemeanor for a person to be in a public place or a place of public resort in a state of intoxication caused by the person's use of alcohol or a controlled substance (as defined in IC 35-48-1-9), if the person:

(1) endangers the person's life;

(2) endangers the life of another person;

(3) breaches the peace or is in imminent danger of breaching the peace; or

(4) harasses, annoys, or alarms another person.

Defendants argue they had probable cause to believe Mr. Rosen was guilty of public intoxication. (DE # 62 at 5.) Defendants have directed the court to evidence that Mr. White explained he had a passenger on board that had been verbally abusive and drinking heavily. Plaintiffs argue that Mr. Rosen had not committed the crime of public intoxication because he was in his own private sleeper compartment. (DE # 65-1 at 8.)

While the court was unable to find any case directly on point, the Indiana Court of Appeals has held that the hallways of a hotel are a "public place" for purposes of the public intoxication statute. *Wright v. State*, 772 N.E.2d 449, 456-57 (Ind. Ct. App. 2002). Because the hallways of a hotel are analogous to the common areas of a train, the court concludes that the common areas of a passenger train constitute a public place for purposes of the Indiana public intoxication statute. Defendants, however, have not directed the court to any evidence that the officers were informed that Mr. Rosen had been in those areas of the train. They were simply told that there was a passenger that needed to be removed because he was disorderly and drunk. Therefore, the information

supplied by Mr. White would not have established all of the elements of public

intoxication under Indiana law, and based on the facts presented, a reasonable jury could

conclude the officers lacked probable cause.

Defendants have not met their initial burden on summary judgment, and are not

entitled to summary judgment on plaintiffs' fourth amendment illegal entry claim.

### 2. Deliberate Indifference

Plaintiffs have also alleged that defendant Witt was deliberately indifferent by

failing to attend to Mr. Rosen's medical needs. (DE # 61 at 12.) Defendants argue that the

undisputed facts show that Officer Witt was not deliberately indifferent to Mr. Rosen's

medical needs.

Plaintiffs bring their medical indifference claim against Officer Witt under the

Fourteenth Amendment because Mr. Rosen was a pre-trial detainee. (DE # 61 at 12.)

Defendants agree with that analysis. (DE # 62 at 4.) While the Fourteenth Amendment

does apply to some pre-trial detainees, it does not apply to all pre-trial detainees.[7] In

*Lopez v. City of Chicago*, the Seventh Circuit held that the Fourth Amendment applies to

people, like Mr. Rosen in this case, who have been arrested without a warrant but have

---

[7] The Eighth Amendment bans deliberately indifferent treatment toward convicted prisoners. *Rosario v. Brawn*, 670 F.3d 816, 820-21 (7th Cir. 2012). Some pre-trial detainees are given the same protection under the Fourteenth Amendment. *Id.; see also Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) ("Our cases thus establish that the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction.").

not yet been taken before a judge for a probable cause determination. 464 F.3d 711, 718-20

(7th Cir. 2006); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011).

Under the Fourth Amendment, a defendant is liable for providing inadequate

medical care if the defendant's response to the plaintiff's medical need is objectively

unreasonable. *Lopez*, 464 F.3d at 719. This is an easier standard to meet than the Eighth

Amendment's deliberate indifference standard. *Id.*; *Williams v. Rodriguez*, 509 F.3d 392,

403 (7th Cir. 2007) ("[T]he deliberate indifference standard under the Eighth and

Fourteenth Amendments requires a higher showing on a plaintiff's part than is necessary

to prove an officer's conduct was 'objectively unreasonable under the circumstances.'"

(quoting *Lopez*, 464 F.3d at 720)).

"To establish a Fourth Amendment denial of medical care claim, [plaintiff] must

establish that (1) Defendants' failure to provide him with medical care was objectively

unreasonable under the circumstances, and (2) Defendants' conduct caused him harm."

*LaSalvia v. City of Evanston*, 806 F. Supp. 2d 1043, 1050 (N.D. Ill. 2011); *see also Ortiz*, 656

F.3d at 530. Four factors are relevant in determining whether Officer Witt's response to

Mr. Rosen's medical need was objectively unreasonable: "(1) whether the officer has

notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the

scope of the requested treatment; and (4) police interests, including administrative,

penological, or investigatory concerns." *Ortiz*, 656 F.3d at 530. "The severity of the

medical condition under this standard need not, on its own, rise to the level of objective

seriousness required under the Eighth and Fourteenth Amendment." *Williams*, 509 F.3d at

403. "[T]he Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Id.*

The only argument defendants make in support of their motion for summary judgment in regard to plaintiffs' inadequate medical treatment claim is that Officer Witt did not believe that plaintiff had suffered injuries serious enough to require hospitalization. (DE # 62 at 4.) Officer Witt, however, had just witnessed Mr. Rosen being Tasered three times. Mr. Rosen also told Officer Witt that he had extreme pain in his arm and that he thought his arm might be broken. (DE # 61-2 at 65-66.) Defendants have not offered any argument as to any police interests that would support Officer Witt's decision to refuse to take Mr. Rosen to a hospital. Thus, based on the facts presented, defendants have failed to meet their initial burden on plaintiffs' inadequate medical treatment claim, and their motion for summary judgment as to that claim is therefore denied.

### 3. Excessive Force

Plaintiffs have also brought excessive force claims against the officers. For the following reasons, defendants' motion will be denied as to those claims.

"Excessive-force claims in the context of an arrest are reviewed under the Fourth Amendment's objective-reasonableness standard." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 861 (7th Cir. 2010). "This inquiry requires an examination of the 'totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government[al] interests at stake.'" *Id.*

(quoting *Jacobs v. City of Chicago,* 215 F.3d 758, 773 (7th Cir. 2000)). The nature and extent of the force an officer may reasonably use "to effectuate an arrest depends on the specific circumstances of the arrest, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* at 861-62 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Because law-enforcement officers must make critical, split-second decisions in difficult and potentially explosive situations, *Graham,* 490 U.S. at 397 [],[the court must evaluate] the reasonableness of the officer's actions 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight [ . . . .]'" *Id.* at 862 (quoting *Graham*, 490 U.S. at 396). The Seventh Circuit has stated that "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Id.*

Defendants make several arguments as to why they are entitled to summary judgment on plaintiffs' excessive force claim. First, defendants argue that Officer Witt is entitled to summary judgment on plaintiffs' excessive force claim because Officer Witt neither hit nor Tasered Mr. Rosen during the altercation in the sleeper car. It is undisputed that the only force Officer Witt used during the altercation was helping the other officers get Mr. Rosen on the ground, and then holding onto Mr. Rosens arm while the other officers Tasered Mr. Rosen. Plaintiffs do not respond to this argument.

Although it appears that Officer Witt did not cause any of Mr. Rosen's injuries, "an excessive force claim does not require any particular degree of injury." *Chelios v. Heavener*, 520 F.3d 678, 690 (7th Cir. 2008). If a jury believed Mr. Rosen's version of events and concluded that Mr. Rosen never acted in threatening manner to the officers, it could conclude that Officer Witt used unreasonable force by taking Mr. Rosen to the ground. *Id.* (reversing district court's decision to grant summary judgment on excessive force claim where officers tackled plaintiff to the ground). Therefore, defendant's motion for summary judgment as it relates to plaintiffs' excessive force claim against Officer Witt is denied.

Defendants Officer King and Officer Slager also argue that they are entitled to summary judgment on plaintiffs' excessive force claim because those officers used a gradual increase of force and because the physical force used was only in response to Mr. Rosen's threatening actions.

The Seventh Circuit's opinion in *Cyrus* is instructive on this issue. In that case, a local man who suffered from bipolar disorder and schizophrenia, and who was well known to police, was reported missing by his family. *Cyrus*, 624 F.3d at 857. The missing man ended up at a partially built home wearing only a bathrobe. *Id.* at 857-58. The owner of the home was present and called the police. *Id.* at 858. A police officer arrived at the scene, and asked the man to come to the squad car to talk. *Id.* The man ignored the request, and instead proceeded to walk toward the partially built home. *Id.* In response, the officer fired and hit the man with his Taser to prevent him from entering the home,

and the man fell to the ground. *Id.* The man attempted to stand up, and the officer

Tasered him a second time. *Id.* The man then did a barrel roll and ended up lying face

down on the home's driveway. *Id.*

At that point, a second officer arrived. *Id.* The two officers attempted to handcuff

the man, but had trouble because the man's hands were tucked underneath his stomach,

and the man was not complying with the officers' orders to produce his hands so they

could be handcuffed. *Id.* The first officer Tasered the man several more times in an

attempt to get the man to comply with the arrest. *Id.* Once the officers were able to get the

man handcuffed, they turned him on this back, and discovered that the man was not

breathing. *Id.* The man was then taken to a local hospital where he was pronounced dead.

The man's parents sued several defendants, including the first officer, alleging the

use of excessive force in violation of the Fourth Amendment. *Id.* The district court

granted summary judgment on the excessive force claim, but the Seventh Circuit

reversed, concluding there were material facts in dispute. *Id.* Specifically, the court held

that the man's barrel role, which the officer characterized as an attempt to flee, could be

viewed by a jury as simply a reaction to being Tasered and therefore, "[t]he evidence

[was] . . . conflicting on the extent to which [the man] resisted arrest." *Id.* at 862-63.

Additionally, although the man had refused to remove his arms from underneath his

stomach, the officer knew that the man was unarmed and could not gain control of a

weapon. *Id.* at 863.

In this case, as in *Cyrus*, conflicting evidence concerning material facts precludes summary judgment. First, although the officers interpreted Mr. Rosen's rising out of his seat and lifting his arm up as a threat, Mr. Rosen contends that he was simply standing up and grabbing hold of the bed for balance. As in *Cyrus*, this "behavior is susceptible of different interpretations." *Id.* at 862.

Additionally, even if a jury were to conclude that the officers acted reasonably by taking Mr. Rosen to the floor, looking at the factors outlined above, a reasonable jury could conclude that the force used once Mr. Rosen was on the floor was excessive. The officers hit Mr. Rosen on the back, stomped on his back, and Tasered him three times.[8] But there is no indication that Mr. Rosen had a weapon or tried to gain control of one, and once he was on the floor with his arms underneath him, it was unlikely he could access a weapon. Moreover, the only crime defendants have identified that they believed Mr. Rosen committed is public intoxication, which is a misdemeanor under Indiana law. IND. CODE § 7.1-5-1-3.[9] Finally, a jury could interpret Mr. Rosen's refusal to put his arms behind his back to be handcuffed as simply a result of being in an extremely small passenger compartment. Thus, like in *Cyrus*, "[t]he evidence is also conflicting on the

---

[8] There is also a factual question regarding whether Officer King's Taser actually stunned Mr. Rosen. (*See* DE # 61-2 at 64; DE # 63-1 at 3.)

[9] The evidence at trial may show that the officers had probable cause to believe that Mr. Rosen committed other crimes, but defendants have not identified those crimes, and "the [c]ourt will not make the parties' arguments for them." *Hernandez v. Partners Warehouse Supplier Servs., LLC*, No. 11 C 7579, 2012 WL 3582971, at *7 (N.D. Ill. August 17, 2012).

extent to which [plaintiff] resisted arrest."[10] *Cyrus*, 624 F.3d at 862; *see also Morfin v. City of East Chicago,* 349 F.3d 989, 1004-05 (7th Cir. 2003).

In sum, questions of material fact remain as to plaintiffs' excessive force claim. Therefore, defendants' motion for summary judgment with regard to that claim is denied. Additionally, defendants' make no argument regarding plaintiffs' excessive force claim as it relates to Mrs. Rosen. (DE # 17 at 11.)

### 4. Failure to Train

Plaintiffs allege that the City of South Bend is liable under a failure to train theory because the officers in this case had not been trained on the proper use of a Taser with the elderly[11] and because the officers had not been trained on Fourth Amendment law when entering a private structure. (DE # 61 at 6-12.) In their motion for summary judgment, defendants argue that their officers were adequately trained on both issues, and therefore are entitled to summary judgment. (DE # 54 at 10-11.)

A municipality can be liable under Section 1983 when the municipality itself causes the constitutional injury. *Dunn v. City of Elgin, Ill.,* 347 F.3d 641, 645-46 (7th Cir. 2003). "One example of this is where the municipality fails to provide adequate police training." *Id.* at 646. "However, 'inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of

---

[10] "To be sure, there is evidence that [Mr. Rosen] did not obey [the officers'] commands. But his behavior is susceptible of different interpretations." *Cyrus*, 624 F.3d at 862.

[11] This essentially amounts to an excessive force failure to train claim.

persons with whom the police come into contact.'" *Id.* (quoting *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)).

Deliberate indifference in the failure to train context can be shown in two ways. "First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation." *Id.; see also Rome v. Meyers,* 353 F. App'x 35, 37 (7th Cir. 2009). "Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the police." *Dunn,* 347 F.3d at 646; *see also Rome,* 353 F. App'x at 37.

Plaintiffs have not alleged or presented any evidence of a pattern of constitutional violations by the police. Therefore, plaintiffs appear to be proceeding under a "single incident" theory of deliberate indifference, and thus, seek to show deliberate indifference by showing that the City of South bend failed " to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation." *Dunn,* 347 F.3d at 646

*Connick v. Thompson,* 131 S. Ct. 1350, 1360-61 (2011), a recent Supreme Court case, is instructive on this issue. The plaintiff in that case attempted to show municipal liability based on a single incident. *Id.* In denying his claim, the Court noted that a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 1360. The

Court, however, noted that its previous decision in *Canton,* 489 U.S. at 378 left open the possibility that a single incident might suffice to show municipal liability. *Id.* at 1361.

The *Canton* court gave a hypothetical situation where a municipality could be liable for its failure to train with evidence of only a single incident: "a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Id.* (citing *Canton,* 489 U.S. at 390, n.10). The Court reasoned that "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.*

Keeping these principles in mind, the court now turns to defendants' arguments on summary judgment. Defendants make two arguments why they are entitled to summary judgment on plaintiffs' failure to train claims. First, defendants argue that plaintiffs have failed to identify any unconstitutional policy or custom that caused a constitutional violation and have also failed to identify any ordnance or policy that is unconstitutional on its face. (DE # 54 at 10.) This argument fails, because, as noted above, a municipality may be held liable under Section 1983 for a failure to train its employees. *Dunn*, 347 F.3d at 646; *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) ("The failure to provide adequate training to its employees may be a basis for imposing liability on a municipality . . . .").

Second, defendants argue that they are entitled to summary judgment on plaintiffs' failure to train claim because the officers in this case were in fact very well

trained. (DE # 54 at 10-11.) Defendants present records showing that all three officers completed Taser training prior to December 31, 2008, the date of the incident. (*See* DE # 54-9, DE # 54-10; DE # 54-11.) Defendants also direct the court to the City of South Bend's Taser training policy. (DE # 54-12.) Finally, defendants presented training logs outlining the various courses the officers have taken as part of their training. (DE # 54-8.)

This evidence, however, does not reveal training on the legal principles relevant to plaintiffs' failure to train claims: Fourth Amendment law regarding excessive force and police entry into private structures. For example, although the officer training logs show that each officer was extensively trained in different areas, there is no indication that they received any training whatsoever on Fourth Amendment limitations regarding entry into private structures. Additionally, although the officers were trained on the proper use of the Taser, there is no indication that the officers were trained on the constitutional limitations of excessive force.

The officers may very well have been trained in both of these areas, but defendants have not directed the court to any evidence indicating that to be the case. Moreover, although plaintiffs have failed to produce evidence of a pattern of violations by the South Bend police, the allegations in this case are similar to the hypothetical case the Supreme Court hypothesized could lead to municipal liability in a "single incident" case. Therefore, defendants have failed to meet their initial burden on summary judgment, and their motion will be denied as to plaintiffs' failure to train claims.

### 5. Summary Punishment

In their complaint, plaintiffs allege that defendants "summarily punished Mr. Rosen by . . . grabbing him, throwing him to the ground, bending his limbs, beating, tasering, handcuffing, formally arresting, and incarcerating him without probable cause or reasonable suspicion . . . ." (DE # 17 at 11.) Plaintiffs contend that this alleged behavior violated the Fifth and Fourteenth Amendments. (*Id.*) In their motion for summary judgment, defendants argue they are entitled to summary judgment on this claim because neither plaintiff was "deprived of a fair trial, deprived of legal counsel, or subjected to illegal interrogation." (DE # 54 at 16.) Plaintiffs do not respond to this argument.

The Seventh Circuit and other courts have, at times, used the terms summary punishment and excessive force interchangeably. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *Johnson v. CHA Sec. Officers*, No. 97 C 3746, 1997 WL 638479, at *1 (N.D. Ill. Oct. 8, 1997) ("Excessive force by a police officer can be characterized as summary punishment . . . ."); *see also Sanchez v. City of Chicago*, No. 10–3801, 2012 WL 5377806, at *6 (7th Cir. Nov. 2, 2012) (citing *Byrd v. Brishke,* 466 F.2d 6, 10–11 (7th Cir. 1972)); *Wells v. City of Chattanooga*, No. 1:09–CV–219, 2011 WL 2749563, at *3 n.7 (E.D. Tenn. July 14, 2011) Additionally, the allegations in plaintiffs' complaint make clear that their summary punishment claim is simply a rehashing of their excessive force claim. (*See* DE # 17 at 4.)

Thus, it appears that plaintiffs' summary punishment claim should be merged into their excessive force claims. Defendants, however, did not make this argument, and the court realizes that it may grant summary judgment *sua sponte* "only if [it has] given the

affected parties advance notice of their intent to do so and a fair opportunity to respond with argument and evidence." *Smith v. Bray*, 681 F.3d 888, 903 (7th Cir. 2012). Therefore, plaintiffs are given thirty days from the date of this order in which to file a response detailing why their summary punishment claim should not be merged into their excessive force claims. If plaintiffs fail to respond, the court will *sua sponte* grant summary judgment on that claim.

### B. State Law Claims

Defendants have also moved for summary judgment on plaintiffs' state law claims. In their motion for summary judgment, defendants briefly mention plaintiffs' state law claims for trespass, invasion or privacy, assault, battery, excessive force, negligent infliction of emotion distress, intentional infliction of emotional distress, and respondeat superior liability for the city of South Bend. Defendants cite no legal authority for any of these arguments. Defendants have not developed these arguments in a meaningful way, and their motion for summary judgment as it relates to these claims is denied.

With respect to plaintiffs' state law false arrest and false imprisonment claims, defendants argue that because they had probable cause to arrest plaintiff, they are entitled to summary judgment on those claims. Defendants are correct that the presence of probable cause would entitle them to summary judgment on plaintiffs' false arrest and false imprisonment claims. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1104 (S.D. Ind. 2008) ("Generally, to succeed upon a claim of false arrest or false imprisonment, Indiana law requires a plaintiff to establish the absence of probable cause for the arrest."); *Conwell v. Beatty,* 667 N.E.2d 768, 775 (Ind. Ct. App. 1996) ("'[P]roof of the absence of probable

cause is essential to the plaintiff's cause of action for false arrest.'" (quoting *Garrett v. City of Bloomington*, 478 N.E.2d 89, 93 (1985))). But, as noted above, the only crime that defendants have identified that the officers had probable cause to believe Mr. Rosen committed is public intoxication, and a question of fact remains as to whether the officers had probable cause to believe plaintiff committed that crime. Therefore, defendants' motion for summary judgment as it relates to plaintiffs' false arrest and false imprisonment claims is denied.

## IV. Conclusion

For the foregoing reasons:

1. Defendants Jason King, Christopher Slager, Andrew Witt, and the City of South Bend's motion for summary judgment is **DENIED**. (DE # 53.) But, as discussed above, the court will *sua sponte* grant summary judgment on plaintiffs' summary punishment claim unless, within 30 days of the date of this order, plaintiffs provide sufficient reason why summary judgment is not appropriate on that claim.

2. Plaintiffs Clifford and Alice Rosen's motion to strike is **DENIED**. (DE # 64.)

3. Plaintiffs Clifford and Alice Rosen's motion to file a sur-reply is **GRANTED**. (DE # 65.)

4. Plaintiffs Clifford and Alice Rosen's motion for a hearing is **DENIED**. (DE # 67.) The court will set a trial date through a separate order.

**SO ORDERED.**

Date: December 18, 2012

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT